UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
    Plaintiff,                 )
                       )
                       )
        v.                     ) CRIMINAL NO. 05-10113-DPW
                       )
                       )
REYLANDO REYES,                    )
a/k/a REYLANDO RISE,               )
a/k/a RAYNALDO RISE,               )
a/k/a RAYLANDO RISE, and           )
a/k/a RAY RISE,                    )
    Defendant.                 )

MEMORANDUM AND ORDER
June 13, 2006

Defendant Reylando Rise,[1] accused of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1), moves to suppress a bullet and other items seized during, as well as statements made in the course of, a stop and search by Boston Police officers on February 27, 2005.  Rise also moves to suppress statements he allegedly made following his arrest April 26, 2005 on the federal felon in possession complaint.  For the reasons explained below, I deny the motion to suppress as to the bullet and other items seized during the February 27, 2005 search

---

    [1]  I will refer to the Defendant as Reylando Rise (the name which, despite the caption in the indictment, he identified as proper during the evidentiary hearing on his motion to suppress) throughout this Memorandum and Order.

but I grant the motion to suppress as to specific statements made on February 27, 2005 and April 26, 2005.

## I. FINDINGS OF FACT

### A. The Events Leading up to the Arrest on February 27, 2005

After a full evidentiary hearing, I find the facts to be as follows:

During the morning and afternoon of Sunday, February 27, 2005, Officers Dennis Cogavin and Timothy G. Laham of the Boston Police Department were patrolling the area of Harvard Street and Bernard Street in Dorchester, Massachusetts in their unmarked car.  Officer Cogavin was driving.  Both officers were in plain clothes.  Between 14:07 and 14:25, the Officers used the Mobile Data Terminal (MDT) in their car to query as to five vehicles and one person while they patrolled the area.  Sometime just before 14:30, the Officers were proceeding up Bernard Street towards Harvard Street when they noticed Rise in a parked tan Ford Taurus on Bernard Street facing the other direction.

Earlier in the day, Rise had taken the Taurus, rented by his friend Tanya Goss, from Ms. Goss's residence without her permission while she slept.  Rise stopped in Codman Square to pick up some illegal drugs on the way to the residence at 150 Harvard Street, which he shared with his grandmother and father. The drive took about five minutes.  Rise made the trip despite being aware that his license had been revoked for a few years. When he arrived at his residence, he parked the car around the

corner on Bernard Street in the location where the Officers later observed it.  Rise then went to a corner store and purchased a Sunday newspaper.  After putting the newspaper in the car, he went upstairs to his apartment and talked to his grandmother and father.

At some point Rise returned to the car to retrieve the newspaper for betting information.  The newspaper was on the floor on the passenger's side of the front seat but because of a snowbank he had to reach in from the driver's side.  As Rise was reaching in, he noticed through the windshield an unmarked car with two white males, who he determined had to be police officers, approaching him on Bernard Street.  Hoping to avoid a confrontation with the Officers, he got in the car and sat in the driver's seat intending to wait for them to pass.

Rise and the Officers looked at each other as the cars were parallel on Bernard Street.  The Officers recognized Rise as a local individual involved in prior incidents with the police and Officer Laham recalled that he might not have a license.  Consequently, Officer Laham reached back to retrieve a binder he and Officer Cogavin had put together of local "high impact players."  The binder contained about 100 mugshot forms for local males that had criminal records.  It was organized by neighborhood.  Rise's mugshot form was on the back of the first page in the second section for the Harvard Street/Bernard Street area.  Rise's mugshot form showed the front and side view of

-3-

Rise's head and gave information including his address on Harvard
Street, his birth date, and that he had a prior charge for
operating a motor vehicle after revocation or suspension of
license.  Rise's name and date of birth were required for the
Officers to do a query on their MDT to confirm that Rise did not
have license.

While Officer Laham was looking up Rise's information in the
binder, Officer Cogavin at 14:27.21 ran an MDT query of the
Florida license plate (W88GVD) on the vehicle in which Rise was
sitting.[2]  After determining Rise's name and birth date from the
binder, the Officers then ran a query on Rise at 14:28.10.  The
information returned from the Massachusetts Registry of Motor
Vehicles three seconds later indicated that Rise's license was
still suspended (REV/RRV).

I find Rise began driving away from the Officers down
Bernard Street before the MDT query confirmed that his license
had been suspended.  It was only after Rise began to pull away
that they came up behind him, having fully executed a U-turn in
the intersection of Harvard Street and Bernard Street and having
confirmed that his license was suspended.  While Rise may have

---

[2]  In this Memorandum, for consistency, I use the times such
as 14:27.21 for the Florida plate query, recorded through the
Boston Police Computer-Aided Dispatch ("CAD") system time stamp.
I recognize that different times, e.g., the time of 14:25 for the
same query by Officer Cogavin of Florida license plate W88GVD,
can be found in the record as a result of the separate Criminal
Justice Information System ("CJIS") time stamp.  I do not attach
significance to difference between these separate time stamps.

interpreted the police vehicle's U-turn as a reason to leave the area, I do not credit his testimony that he only reluctantly began driving down Bernard Street when the Officers pulled up behind him after executing the U-turn and then, about a minute later, flashed their front lights.

The police vehicle followed Rise down Bernard Street for several blocks to Talbot Avenue.  After Rise took a left onto Talbot Avenue, the Officers flashed their lights to get Rise to pull over, which he did near the intersection of Talbot Avenue and Colonial Avenue.  The Officers inputted the execution of a traffic stop into the MDT at 14:30.11.  The Officers subsequently inputted a change in the type of stop from traffic stop to arrest at 14:57.32, according to the MDT log.

**B. The Stop and Arrest on February 27, 2005**

After pulling Rise over on Talbot Avenue, Officer Cogavin approached the driver's side door.  Officer Cogavin asked Rise for his license and registration.  Rise responded that he did not have a license because it had been suspended.  Officer Cogavin, concerned about his safety, asked Rise whether "he had anything on him."  Rise replied that he had a "bag of weed."  After asking Rise to exit the vehicle, which he did, Officer Cogavin searched Rise's person and found a nine millimeter bullet in the left front pocket of Rise's jeans.  At that point, he handcuffed Rise and informed him that he was being charged with possession of

ammunition.  Although no <u>Miranda</u> warnings had then been given, Officer Cogavin asked Rise questions about the bullet and whether he had a gun.   Rise replied that he had just found it in his front yard.

Officer Cogavin resumed his pat-down search of Rise and found a bag of marijuana and two bags of crack cocaine in the left front pocket of the sweat pants Rise was wearing under his jeans.  After finding the drugs, Officer Laham said to Rise, "you don't smoke crack, do you Ray?"  The record does not establish that Rise responded to this inquiry.

The Officers eventually called for a police cruiser to transport Rise to the station.  Neither of them read Rise his <u>Miranda</u> rights at any time at the scene.

## C. The Arrest on the Federal Complaint on April 26, 2005

On April 26, 2005, Rise was inside the Dorchester District courthouse, not then in custody, waiting for his state court (ammunition) case to be called when Special Agent Lisa Rudnicki of the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") approached him.  She was accompanied by ATF Special Agents Philip Ball and John Paolillo and Boston Police Officers Thomas Griffiths, John Puglia, Timothy Laham, and Henriques. Special Agent Rudnicki identified herself and told Rise that he was subject to a federal arrest warrant.  Special Agents Paolillo and Ball placed Rise in handcuffs and immediately led him to the

awaiting ATF vehicle while Special Agent Rudnicki brought a copy of the federal arrest warrant to the Assistant District Attorney in charge of Rise's state case.

When Special Agent Rudnicki returned to the ATF vehicle, Rise was already seated in the backseat.  Special Agent Rudnicki got in the backseat with Rise.  During transport to the ATF Office in Boston for processing, Special Agent Rudnicki informed Rise of the federal charge for being a felon in possession of ammunition and advised him of his <u>Miranda</u> rights.  Special Agent Rudnicki restricted her questioning of Rise to "personal identifiers" because she understood that Rise had already obtained legal counsel on the originating state charges.  She did, however, show Rise his Massachusetts Board of Probation Criminal History and asked Rise to confirm it was accurate, which he did.

In the elevator at the ATF Office, Special Agent Rudnicki, with Special Agents Paolillo and Ball present, suggested to Rise that the arrest had gone more smoothly than she had anticipated. Rise replied something to the effect that he knew enough not to resist when he saw six officers approaching.  Special Agent Rudnicki then indicated that she had sought additional support in anticipation of his non-compliance, to which Rise responded, "You had a good plan."

After processing, Rise was then transported to the U.S. Marshals Service lockup to await his initial appearance at the

U.S. District Court.  When Special Agent Ball was escorting Rise
to the U.S. Marshals' cell block, he asked Rise why he was
wearing all black.  Rise responded to the effect that he wore
black to maintain his tactical advantage on the street.

## II. CONCLUSIONS OF LAW

### A. February 27, 2005

Rise moves to suppress the bullet and other items seized by
Officers Cogavin and Laham on February 27, 2005 arguing that the
Officers illegally stopped him while driving his friend's rental
car.  Rise also moves to suppress certain statements made
incident to the stop and arrest.

### 1. Legality of the Stop

By definition, a traffic stop "embodies a detention of the
vehicle and its occupants.  It therefore constitutes a seizure
within the purview of the Fourth Amendment."  United States v.
Chhien, 266 F.3d 1, 5 (1st Cir. 2001).  This means that police
officers may only execute a traffic stop if they have a
"reasonable and articulable suspicion of criminal activity," and
their actions "must be reasonable under the circumstances."  Id.
at 6.  "To work the calculus of reasonable suspicion in the
context of a traffic stop, an inquiring court must ask whether
the officer's actions were justified at their inception, and if
so, whether the officer's subsequent actions were fairly
responsive to the emerging tableau -- the circumstances

originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." Id.

Here, the Officers observed Rise operate a motor vehicle down Bernard Street after receiving information confirming that his license had been suspended.  Consequently, as Rise admits, the stop was justified, at least on its face.  Nevertheless, Rise argues that the apparent legitimacy of the stop is undercut by the fact that Officers Cogavin and Laham intentionally created the requisite cause to stop Rise's vehicle by ordering him to start the vehicle and drive knowing that he had no license. Underlying this factual claim is Rise's legal contention that the Government may not rely on circumstances of their own deliberate invention to support and justify a traffic stop.  Rise analogizes this proposition with the rule that police officials cannot create exigent circumstances to justify a warrantless search. See, e.g., United States v. Cresta, 825 F.2d 538, 553 (1st Cir. 1987), cert. denied, 486 U.S. 1042 (1988); and United States v. Curzi, 867 F.2d 36, 43 n. 6 (1st Cir. 1989) citing United States v. Morgan, 743 F.2d 1158, 1163 (6th Cir. 1984), cert. denied, 471 U.S. 1061 (1985).

Since I have determined, as a factual matter, that Officers Cogavin and Laham did not pull behind Rise and flash their lights to get him to drive away in order to create a reason to stop and search him, I find that the stop was justified.  While Rise may have interpreted the police vehicle's U-turn and approach as a

-9-

reason to leave the area, that does not support a finding that
the Officers deliberately caused Rise to drive without a license
in order to justify a traffic stop.

2. <u>Fruits of the Stop</u>

Rise argues that the items seized after the stop must be
suppressed as fruits of an illegal stop.  Rise does not argue
that the pat-down search of his person following the stop, which
"amounts to a <u>Terry</u> stop within a <u>Terry</u> stop," <u>Chhien</u>, 266 F.3d
at 7, lacked justification.  I decline to suppress the items
seized because the stop was justified and because I find that the
pat-down under these circumstances of a known criminal, whose
mugshot form indicated he had previously been charged with
resisting arrest, was justified.

3. <u>Statements made during the stop</u>

With respect to the statements made following the stop, Rise
argues that they must be suppressed as fruits of an illegal
search and seizure and because they were elicited during a
custodial interrogation prior to the recitation of his <u>Miranda</u>
rights.  The former argument fails given my factual findings, but
the latter requires more exploration.

Rise argues that he was in custody immediately following the
traffic stop, but not given his <u>Miranda</u> rights until he was
booked.  Consequently, he seeks to suppress all statements
elicited through custodial interrogation.  The statements at
issue are not clearly delineated in Rise's motion to suppress,

-10-

but appear to be (1) his statement that he had a bag of weed on him, (2) his explanation of where the bullet came from, and (3) any other answers to questions after he was handcuffed.

Officer Cogavin testified that he handcuffed Rise after Rise told him he had a bag of weed and after patting him down and finding the bullet.  Even assuming that Rise was in custody before Officer Cogavin asked him if he had anything on him,[3] "Miranda warnings need not precede 'questions necessary to secure [an officer's] own safety or the safety of the public' for a suspect's answers to be admissible as evidence of his guilt." United States v. Fox, 393 F.3d 52, 60 (1st Cir. 2004), vacated on other grounds, 125 S.Ct. 2949 (2005), quoting New York v. Quarles, 467 U.S. 649, 659 (1984).  Thus, an officer making a traffic stop may ask "questions 'reasonably prompted by a concern for ... safety,' which must be distinguished from those 'designed

---

[3] As the Supreme Court has observed, "the usual traffic stop is more analogous to a so-called 'Terry stop' than to a formal arrest." Berkemer v. McCarty, 468 U.S. 420, 439 (1984) citing Terry v. Ohio, 392 U.S. 1 (1968).  Consequently, "the stop and inquiry must be reasonably related in scope to the justification for their initiation.  Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond.  And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." Id. at 439-40 (internal citations, footnote, and quotations omitted).  If, however, "a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Id. at 440.

solely to elicit testimonial evidence from a suspect.'"  <u>Fox</u>, 393
F.3d at 60 <u>quoting</u> <u>Quarles</u>, 467 U.S. at 656, 659.  I will not
suppress Rise's admission that he had a bag of weed in response
to Officer Cogavin's appropriate question of whether he had
anything on him since that question was prompted by legitimate
safety concerns.

I will, however, suppress any statements Rise made in
response to the other questions asked by Officers Cogavin and
Laham after they handcuffed him, including Rise's response that
he had just found the bullet in his front yard and any response
Rise may have given to Officer Laham's statement, "you don't
smoke crack, do you Ray?"  It is well settled that "a confession
resulting from custodial interrogation not preceded by
appropriate warnings is normally inadmissible against the
speaker."  <u>United States v. Genao</u>, 281 F.3d 305, 310 (1st Cir.
2002) <u>citing</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 431-32
(2000).  Here, Rise was in custody, at least by the time he was
handcuffed.  The Officers did not advise him of his <u>Miranda</u>
rights and their questions about the source of the bullet and
whether Rise smoked crack amounted to interrogation, a
circumstance the legal dimensions of which are more fully
explained <u>infra</u> in Section II.B.2.

**B. April 26, 2005**

Rise argues that statements made by him following his arrest

on the federal complaint on April 26, 2005 must also be
suppressed because the questioning was in violation of the Fifth
Amendment because they (1) were obtained in the absence of
counsel after Rise had been appointed counsel on the state
charges, and (2) they occurred prior to advising him of his
<u>Miranda</u> rights.

1. <u>Sixth Amendment</u>

A Sixth Amendment argument is unavailing in these
circumstances.  Rise relies in his Memorandum simply on a
footnote citation to <u>Massiah v. United States</u>, 377 U.S. 201
(1964).  <u>Massiah</u> and its progeny develop the rule that once a
defendant asserts his right to counsel at an arraignment or
similar proceeding, any waiver of the defendant's right to
counsel for any subsequent police-initiated interrogation is
invalid under the Sixth Amendment.  <u>See</u> <u>United States v. Coker</u>,
433 F.3d 39, 42 (1st Cir. 2005) <u>quoting</u> <u>Michigan v. Jackson</u>, 475
U.S. 625, 636 (1986).  However, the Sixth Amendment right to
counsel is "offense specific.  It cannot be invoked once for all
future prosecutions." <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175
(1991).  After "[s]ome state courts and Federal Courts of Appeals
read into <u>McNeil</u>'s offense-specific definition an exception for
crimes that are 'factually related' to a charged offense," the
Supreme Court rejected that approach.  <u>See</u> <u>Texas v. Cobb</u>, 532
U.S. 162, 168 (2001).  Instead, in <u>Cobb</u> the Court "re-emphasized
that the Sixth Amendment is offense-specific and looked to its

-13-

Fifth Amendment double jeopardy jurisprudence to define the term
'offense' in the Sixth Amendment context." Coker, 433 F.3d at 43
citing Cobb, 532 U.S. at 172-73.  Consequently, the proper test
is the one articulated in the double jeopardy context in
Blockburger v. United States, 284 U.S. 299, 304 (1932): "where
the same act or transaction constitutes a violation of two
distinct statutory provisions, the test to be applied to
determine whether there are two offenses or only one, is whether
each provision requires proof of a fact which the other does
not."  Coker, 433 F.3d at 43 quoting Cobb, 532 U.S. at 173.

Since the Court in Cobb stated that there is "no
constitutional difference between the meaning of the term
'offense' in the contexts of double jeopardy and of the right to
counsel," Coker, 433 F.3d at 43 quoting Cobb, 532 U.S. at 173,
several Circuits, including the First Circuit, have adopted the
dual sovereignty doctrine from double jeopardy jurisprudence for
the purpose of defining what constitutes the same offense in the
Sixth Amendment right to counsel context.  Coker, 433 F.3d at 44
adopting the reasoning in United States v. Avants, 278 F.3d 510
(5th Cir. 2002) and rejecting the reasoning in United States v.
Mills, 412 F.3d 325 (2d Cir. 2005).  See also United States v.
Alvarado, 440 F.3d 191, 198 (4th Cir. 2006)(joining the Circuits
that have employed the dual sovereignty doctrine in the Sixth
Amendment context).  The dual sovereignty doctrine means that "a
defendant's conduct in violation of two separate sovereigns ...

-14-

constitutes two distinct offenses."  Coker, 433 F.3d at 43.[4]

Here, it appears that Rise asserted his right to counsel at an arraignment for state charges for operating after a suspended license, possession of ammunition without a permit for a firearm, possession of a Class D contraband substance, and possession to distribute a Class D contraband substance.  The federal complaint relates to a charge for felon in possession of ammunition.  Since the state ammunition charge requires proof that Rise did not have a permit for a firearm, see Mass. Gen. Laws ch. 269, § 10, and the federal charge requires proof that Rise "has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year," see 18 U.S.C. § 922(g)(1), each provision requires proof of a fact which the other does not.  Consequently, they are not considered the same offense for Sixth Amendment purposes.  Moreover, Rise's conduct in violation of state and

---

[4] There is an exception to the dual sovereignty doctrine. In United States v. Guzmán, 85 F.3d 823 (1st Cir. 1996), the First Circuit interpreted certain language in Bartkus v. Illinois, 359 U.S. 121 (1959) "to mean that an exception to the dual sovereignty doctrine (the 'Bartkus exception') exists where 'one sovereign so thoroughly dominates or manipulates the prosecutorial machinery of another that the latter retains little or no volition in its own proceedings.'" United States v. Coker, 433 F.3d 39, 45 (1st Cir. 2005) quoting Guzmán, 85 F.3d at 827. "This exception applies with equal force in the Sixth Amendment context.  Thus, if it appears that one sovereign is controlling the prosecution of another merely to circumvent the defendant's Sixth Amendment right to counsel, under the Bartkus exception the dual sovereignty doctrine will not apply."  Coker, 433 F.3d at 45.  Here, there is no evidence that "one sovereign was a pawn of the other, with the result that the notion of two supposedly independent prosecutions is merely a sham." Guzmán, 85 F.3d at 827.

federal sovereigns constitutes two distinct offenses under the
dual sovereignty doctrine.  Thus, Rise's argument that the
statements he made following his arrest on the federal complaint
should be suppressed because they were elicited in the absence of
counsel after Rise had been appointed counsel on the state
charges fails as a matter of law.

2. <u>Fifth Amendment</u>

　　　Although Special Agent Rudnicki advised Rise of his <u>Miranda</u>
rights in the ATF vehicle shortly after he was taken into
custody, I find certain of Rise's subsequent statements must be
suppressed.

　　　The Government argues that because Rise was given his
<u>Miranda</u> rights and because none of the questions posed amounted
to an interrogation related to his arrest, the statements Rise
made to Special Agents Rudnicki and Ball are admissible.  I
disagree that the questions posed by Special Agents Rudnicki and
Ball about (a) Rise's criminal history, (b) the execution of the
arrest, and (c) his clothes, did not amount to interrogation.

　　　For the purpose of applying <u>Miranda</u>, "interrogation is
'express questioning or its functional equivalent.'"  <u>Genao</u>, 281
F.3d at 310 <u>quoting</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01
(1980).  "Interrogation occurs only when police conduct is
'reasonably likely to elicit an incriminating response from the
suspect.'" <u>Genao</u>, 281 F.3d at 310 <u>quoting</u> <u>Innis</u>, 446 U.S. at 301.
Of course, "'words or actions ... normally attendant to arrest

-16-

and custody' do not constitute interrogation." <u>Genao</u>, 281 F.3d
at 310 <u>quoting</u> <u>Innis</u>, 446 U.S. at 301.

Here, the questions and comments of the Special Agents in
all three situations were gratuitous and not normally attendant
to arrest and custody.  Rather they were of a type reasonably
likely to elicit an incriminating response from the suspect and
did so.

Rise's responses may nonetheless be admissible if the
Government can meet its burden of establishing that Rise
voluntarily, knowingly, and intelligently waived his <u>Miranda</u>
rights in responding to the questions and comments of Special
Agents Rudnicki and Ball.[5]  Here, I find the Government's proof
lacking.  While it is unclear whether Rise specifically indicated
that he wished not to answer questions, neither Special Agent

---

[5] According to <u>Miranda</u>, "'[i]f the individual indicates in
any manner, at any time prior to or during questioning, that he
wishes to remain silent, [or if he] states that he wants an
attorney, the interrogation must cease.'"  <u>Moran v. Burbine</u>, 475
U.S. 412, 420 (1986) <u>quoting</u> <u>Miranda v. Arizona</u>, 384 U.S. 436,
473-74 (1966).  However, "[t]he defendant may waive effectuation"
of the rights conveyed in the warnings "provided the waiver is
made voluntarily, knowingly and intelligently.'" <u>Moran</u>, 475 U.S.
at 421 <u>quoting</u> <u>Miranda</u>, 384 U.S. at 444, 475.  "The inquiry has
two distinct dimensions.  First, the relinquishment of the right
must have been voluntary in the sense that it was the product of
a free and deliberate choice rather than intimidation, coercion,
or deception.  Second, the waiver must have been made with a full
awareness of both the nature of the right being abandoned and the
consequences of the decision to abandon it.  Only if the totality
of the circumstances surrounding the interrogation reveal both an
uncoerced choice and the requisite level of comprehension may a
court properly conclude that the Miranda rights have been
waived." <u>Moran</u>, 475 U.S. at 421 (internal citations and
quotations omitted).

sought to assure that Rise understood his rights and neither
obtained an express written or oral waiver prior to eliciting any
of the three statements.  With respect to the most incriminating
of the statements, Special Agent Rudnicki sought no waiver from
Rise before asking him to confirm his criminal history, the
answer to which provided admission to an element of the federal
offense for which he was charged.  Although an explicit statement
of waiver is not invariably necessary to support a finding that
Rise waived his rights to remain silent or to counsel, <u>see</u> <u>North
Carolina v. Butler</u>, 441 U.S. 369, 376 (1979), the Government has
not met its burden of establishing that Rise voluntarily,
knowingly, and intelligently waived his <u>Miranda</u> rights in
response to the Agents' indirect post-arrest inquires.  Thus, I
will suppress Rise's post-arrest statements to Special Agents
Rudnicki and Ball.

### III. CONCLUSION

For the reasons set forth more fully above, I DENY Rise's
motion to suppress in part and I GRANT Rise's motion to suppress
in part.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE